THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

JESSICA LORD,

      Plaintiff,

      v.

U.S. BANK, NA,

      Defendant.

No. 3:16-cv-0395-PK

**OPINION AND ORDER**

**PAPAK, J.**

Plaintiff Jessica Lord brings this employment discrimination action against defendant U.S. Bank, asserting state law claims for retaliation and gender discrimination. Plaintiff claims that Defendant unfairly disciplined her and terminated her because she refused a dinner invitation from a supervisor.

Defendant now moves for summary judgment. For the following reasons, I grant the motion for summary judgment.

## BACKGROUND

In the summer of 2012, Defendant hired Plaintiff to work as a part-time teller at its branch in Argay Square, Portland. About a year later, Plaintiff transferred to Defendant's branch on Martin Luther King, Jr. Blvd. (the MLK Branch).

In Defendant's January 2014 performance review of Plaintiff 's work for the year 2013, which covered her time at both the Argay Park and MLK Branches, Plaintiff received an overall rating of "needs improvement," which is the second lowest possible rating. Def. Mot., Ex. 5, ECF No. 20-5. As to specific duties, Plaintiff received the lowest possible rating, "not effective," for referrals, i.e., referring bank customers to use other services. (All branch tellers "have the same quarterly and annual goals for referrals and their performance in respect to referrals is evaluated against a standard scale." Williams Decl. ¶ 5, ECF No. 21.) Plaintiff received the second lowest rating for balancing and for cash drawer differences. The manager's comment section[1] of the performance review states, "Overall [Plaintiff] had a great year in customer service, but needs to make some improvements in . . . referrals, balancing, attendance." Def. Mot., Ex. 5, at 5, ECF No. 20-5. At her deposition, Plaintiff testified that the performance review for 2013 was a "fair assessment." Def. Mot., Ex. 1, at 52, ECF No. 20-1 (Lord Depo.). On March 1, 2014, Plaintiff received a merit pay raise.

On June 1, 2014, Nicholas Domine began working at the MLK Branch as a sales and service manager, or SSM. Domine supervised Plaintiff.[2] Plaintiff testified at her deposition that around the first week of July 2014, she was talking to Domine

> about what I was going to do that weekend, or whatever day it was coming up. I told him that I didn't have plans, that I was really bummed out because I was blown off for my birthday [June 10] and that these people I had plans with ended up bailing, but I hung out with my mom and that was kind of lame. And he had asked if I wanted to go out to dinner and grab a drink, to which I was kind of like,

---

[1]When the 2014 performance review was issued, Corie Spriggs was branch manager at the MLK Branch. Def. Mot., Ex. 5, at 6, ECF No. 20-5.

[2]Plaintiff alleges that Domine was temporary acting manager at this time. Lord Decl. ¶ 5, ECF No. 27. I credit Defendant's evidence, however, that Domine was "never employed . . . as an interim branch manager at any of its branches," and that Ryan O'Neil was the branch manager at the MLK Branch from February 2014 through September 2014. Crabtree Suppl. Decl. ¶¶ 6, 7, ECF No. 30.

> Oh, I don't know.  And he came back maybe a couple of minutes later and said,
> Well, I don't have my wallet, so never mind.  And I said, Well, I have a boyfriend,
> so never mind.  That probably wouldn't have worked out.

Lord Depo. at 82.  Plaintiff stated that she "relayed that message on to Desiree Vielmetti

[apparently a service and sales manager], and she was like, Well, managers can't go out with

their -- other people that they are bosses over." Lord Depo. at 83.  Plaintiff has not presented

evidence that she told any supervisor other than Vielmetti about Domine's alleged dinner

invitation.

Plaintiff now states, "After Domine asked me out, his behavior toward me changed in that

he stopped coming by my work station unless he had to discuss a work matter with me, whereas

before he would look for excuses to come by and talk to me." Lord Decl. ¶ 7. Although the

alleged dinner invitation occurred about  a month after Domine starting work at the MLK

Branch, Plaintiff testified that she had a good working relationship with Domine for the first

"four to six months, roughly." Def. Reply, Ex. 1, at 32 (Lord Depo.), ECF No. 29-1.

Plaintiff states that after Domine learned that she was dating a female security officer, he

"began making sarcastic comments about my dating habits and how he wasn't my type." Lord

Decl. ¶ 8. At her deposition, Plaintiff testified that she was not offended by Domine's comments,

which were not "mean jokes." Def. Reply, Lord Depo. at 34.  Plaintiff also testified that Domine

made about one comment a week for a month, and the comments then "fizzled out on their own."

Lord Depo. at 35.  Plaintiff never complained about the comments to anyone.

On September 16, 2014,  Mandi Van Der Sluis began working as a sales and service

manager at the MLK Branch, apparently replacing Vielmetti.  On October 1, 2014, Althea

Williams became the branch manager for the MLK Branch.

On October 24, 2014, Van Der Sluis signed a 90-day Action Plan for Plaintiff because

Plaintiff had two cash outages of $100 or more.  Van Der Sluis "was in charge of operations and .
. . pulled all the reports as far as balancing and that sort of thing."  Def. Reply, Ex. 3, at 41, ECF
No. 29-3 (Van Der Sluis Depo.).  Although Domine generally supervised Plaintiff, Van Der Sluis
testified that "when instances happened like this where there were multiple outages I took the
initiative to contact HR and get an action plan in place.  So I was the one communicating with
Haley Crabtree in HR."  *Id.*  Domine would be notified about the Action Plan if he supervised the
employee, but he would not necessarily have any input beforehand.

The Action Plan here noted that on October 9, 2014, Plaintiff had an "unlocated cash
difference" of -$100.00, and that on October 11, 2014, Plaintiff cashed a $267.34 check for a
non-customer and processed the check as $627.34, for a loss of $360.  The Action Plan instructed
Plaintiff to take precautions including counting cash three times and completing "a trial balance
before each break."  Def. Mot., Ex. 5.  While an employee is subject to an Action Plan, she is
not eligible for transfer, promotion, or merit pay increases.  The Action Plan here expired January
22, 2015.  Plaintiff does not dispute that the Action Plan was justified.

On January 26, 2015, branch manager Williams issued a performance review for
Plaintiff's work during 2014.  Def. Mot., Ex. 13.  Plaintiff received an overall rating of "Solid
Performance," a better rating than she received in her performance review for 2013.  Plaintiff
was rated as "Needs Improvement" in referrals and cash balancing.  Plaintiff testified that this
was a fair review.

Plaintiff alleges that Lakisha Patterson, a teller at the MLK Branch, was initially friendly
but began criticizing Plaintiff "after a customer and friend of hers, Wally Trice Jr., began
favoring [Plaintiff's] teller window over hers."  Lord Decl. ¶ 14.  On February 19, 2015,
Patterson spoke to Plaintiff about wearing a miniskirt shorter than allowed by Defendant's dress

code. Lord Decl., Ex. 4. Patterson had recently become a teller coordinator. Teller coordinators are not managerial employees, and have "no authority to hire, fire, discipline, promote, or authorize merit pay increases." Crabtree Suppl. Decl. ¶ 8 & Ex. 32, ECF Nos. 30, 30-4. The incident was noted on a "Significant Event Form" for Plaintiff, with an entry initialed by Van Der Sluis, stating, "Kisha spoke with [Plaintiff] today about dress code, specifically about not wearing short miniskirts to work." Lord Decl., Ex. 4, at 1. Plaintiff does not contend that her skirt was in compliance with the dress code. Defendant did not discipline her for this conduct.

The Significant Event Form for Plaintiff in early 2015 includes other entries about her daily work performance, good or bad. The entries were mainly by Van Der Sluis, with a few entries by Domine. For example, the entry for January 13, 2015 states that Plaintiff left a $100 bill in a night drop bag; the entry for January 15, 2015, states, "Kisha observed [Plaintiff] leaving her top and bottom drawers unlocked after leaving her work station," and the entry for February 21, 2015, states that Plaintiff gave account information to a bank customer who was not authorized to receive the information. Lord Decl., Ex. 4. Defendant characterizes such entries as "coaching notes" with no effect on the terms or conditions of employment. Def. Reply 6.

On February 23, 2015, Plaintiff received a second Action Plan, again based on her failure to keep a daily balance. The Action Plan stated that on February 5, 2015, Plaintiff had an unlocated cash difference of -$479.50, and on February 12, 2015, she had an unlocated cash difference of +$197.00. Lord Decl., Ex. 3, ECF No. 27-3. Plaintiff does not dispute the factual basis for the Action Plan. She asserts that Domine recommended that she be placed on the Action Plan, but like the prior Action Plan, this one was issued by Van Der Sluis.

On March 1, 2015, Plaintiff received a merit pay raise. Def. Mot., Lord Depo. 23, ECF No. 20-1. In late February or early March 2015, Plaintiff had a "coaching session" with

Page -5-  OPINION AND ORDER

Domine.  Domine and Van Der Sluis met regularly with tellers to discuss job performance.

During this session, Domine spoke to Plaintiff about her failure to meet her goal for referrals,

which was an ongoing issue for Plaintiff.  At her deposition, Plaintiff testified,

> Nick [Domine] and I were having a conversation about my performance at his
> desk, and he had said he was the only one that wanted to keep me at the bank.
> That he was the only one fighting to have me there, which kind of threw me off
> because I had a good working relationship with everyone else.

Def. Mot., Ex. 1, at 93.

After talking to Domine, Plaintiff told Patterson about Domine's comments.  Patterson

told Plaintiff to "report that to HR because that's not true." Def. Mot., Ex. 1, at 94.  Plaintiff then

talked to Van Der Sluis.  Van Der Sluis testified that Plaintiff "was upset thinking Althea

[Williams, MLK Branch manager] and I had given up on her and didn't want her around any

more." Macke Decl., Ex. 4, at 37, ECF No. 28-4.  Van Der Sluis testified that she and Williams

had not given up on Plaintiff, although they "were a little tired of the balancing record she had."

Macke Decl., Ex. 4, at 38.  Williams also talked to Plaintiff about Domine's statements,

reassuring Plaintiff that she was not unwanted.  Macke Decl., Ex. 5, at 49.

Williams then talked to Domine about his statements to Plaintiff.  Williams testified that

Domine told her that he was trying to explain to Plaintiff that "because of the [referral] goals that

were set for [Plaintiff] and she didn't attain them, he felt like he was doing the work and tried to

save her job more than she was." Macke Decl., Ex. 5, at 49-50.  Domine told Williams that he

did not intend to tell Plaintiff that "nobody wanted her." Macke Decl., Ex. 5, at 50.

After Williams's conversation with Domine, she talked to Plaintiff.  Plaintiff testified that

Williams told her "that [Domine] didn't mean it that way." Lord Depo. 96.  Plaintiff did not

remember "the context of how [Williams] explained what he was meaning." *Id.*  In her

declaration, Plaintiff now characterizes Domine's statements as "strongly suggest[ing] that I

should show appreciation for him--implicitly by going on a date with him--because he could protect my job." Lord Decl. ¶ 9.

Plaintiff testified that soon after Williams had talked to Domine, Domine told Plaintiff, "I thought that [the discussion] could stay between you and I. I thought that was private. And I said, Okay. And he was like, Okay. And then he left." Lord Depo. at 96. Plaintiff testified that nothing further happened with Domine after that conversation.

Plaintiff now states that Domine's statement about privacy "made me even more uncomfortable as I now believed that [Defendant] would take no action to protect me from Domine and instead were disciplining me. I again reported this comment to Althea Williams, making it clear that Domine was acting inappropriately and making me feel uncomfortable." Lord Decl. ¶ 11. Williams spoke to Domine about his statement to Plaintiff, "explaining to him that he can't really say a conversation between employees is private. It isn't." Macke Decl., Ex. 5, at 51.

Williams testified that when Plaintiff complained about Domine's privacy statement, Plaintiff did not tell her that she felt intimidated by Domine. Macke Decl., Ex. 5, at 51. Williams testified that if Plaintiff had said "she felt uncomfortable or intimidated, then it would have been addressed as such, but she didn't say that." *Id.*

Plaintiff was terminated because of an incident with a bank customer that occurred May 8, 2015. That day, Plaintiff and Patterson were working at adjacent teller windows. At about 5 p.m., a regular bank customer, Jamaine Grayson, entered the bank.[3] Plaintiff and Patterson were both familiar with Grayson.

Grayson cut in line to go to Plaintiff's window, and Plaintiff handed him a bank

---

[3] Defendant has submitted video of these events from three camera angles.

envelope. Grayson walked back to a counter and placed something in the envelope. He waited in line, and when it was his turn, Patterson called him to her window. Grayson talked to Patterson for several minutes, but did not conduct any banking business. During his conversation with Patterson, Grayson stepped toward Plaintiff's adjacent window and slid the bank envelope back to Plaintiff.

On May 14, 2015, Patterson told Williams that she thought Plaintiff had purchased cocaine from a customer in the bank on May 8. At Williams's request, Patterson wrote a statement about why she suspected Plaintiff had purchased drugs. Williams Decl., Ex. 24, ECF No. 21-4.

After talking to Patterson, Williams reported the incident to Hayley Crabtree, human resources business partner, and to Defendant's corporate security. Crabtree investigated the incident, viewing the video and talking to Patterson.

On May 19, 2015, Crabtree and Kathy Benson, who worked for corporate security, interviewed Plaintiff at the MLK Branch about the May 8 incident. Plaintiff denied that she had purchased drugs. Plaintiff said that before the incident, she had visited Grayson at his house and loaned him $20 to purchase a cleaning product so he could detail her car. When Grayson was unable to purchase the cleaning product, he went to the MLK Branch to return the money to Plaintiff. Plaintiff said that the envelope Grayson handed to her contained $20. Plaintiff offered to take a drug test, but Defendant did not ask her to do so.

Crabtree recommended termination. Crabtree believed that Plaintiff had conducted a drug transaction, and that even if drugs were not involved, Plaintiff admitted conducting a personal financial transaction with a bank customer at her teller window, which violated

Defendant's Code of Ethics.[4]  After talking to Crabtree, Williams decided to terminate Plaintiff because she was on a "second Action Plan for performance issues and because she admitted to engaging in a personal transaction with a customer at her teller window." *Id.*  In addition to the balancing problems noted in the two Action Plans, Plaintiff had multiple cash outages of less than $50 that she could not account for, which Crabtree considered excessive for a teller with Plaintiff's experience.  Crabtree Decl. ¶ 12.  District Manager Lance Rudge approved Williams's decision to terminate Plaintiff.  Williams states that she did not consult Domine or Van Der Sluis about the decision.  Williams Decl. ¶ 11.  A few weeks later, Defendant ended its banking relationship with Grayson because of the incident.

As evidence of how a comparable employee was treated, Defendant submits employment records for Andre Yu, a male teller who reported to Domine.  Like Plaintiff, Yu received two Action Plans for balancing errors.  Crabtree Supp. Decl. ¶¶ 3-5 & Exs. 29-31, ECF Nos. 30, 30-1 to 30-3.  Like Plaintiff's records, Yu's Significant Event Forms note multiple minor transgressions such as lateness, leaving keys unattended, and failure to lock the top cash drawer before leaving work.  Crabtree Supp. Decl., Ex. 30.

## LEGAL STANDARDS

The court must grant summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  If the moving party shows that there are no genuine issues of material fact, the nonmoving party must go beyond the pleadings and designate facts showing an issue for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A factual dispute is genuine "if the evidence is such that a

---

[4]The Code of Ethics states, "Never use company resources to . . . [c]onduct outside business activities."  Crabtree Decl., Ex. 28, at 4, ECF No. 22-4.  The Code also provides, under the heading "Personal Finance," that employees are forbidden from participating in financial transactions with customers, including lending or borrowing money.  Ex. 28, at 5.

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law governing a claim or defense determines which facts are material. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998). In ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party and may not make credibility determinations or weigh evidence. *See Anderson*, 477 U.S. at 255.

## DISCUSSION

### I. Retaliation Claim

Plaintiff brings a claim under Or. Rev. Stat. § 659A.030(1)(f), asserting that Defendant retaliated against her for reporting gender-based harassment. To establish a retaliation claim under Oregon law, "A plaintiff must prove that: 1) the defendant intentionally retaliated against the employee because he or she filed a discrimination complaint; 2) the defendant did so with the intent of forcing the employee to leave the employment; and 3) the employee left the employment as a result of the retaliation." *Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011) (citing *Seitz v. Albina Human Res. Ctr.*, 100 Or. App. 665, 674-75, 788 P.2d 1004, 1010 (1990)). "To establish causation [the plaintiff] must show by a preponderance of the evidence that engaging in the protected activity was one of the reasons for [the plaintiff's] firing and that but for such activity [the plaintiff] would not have been fired." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064-65 (9th Cir. 2002).

I agree with Defendant that no reasonable jury could find that Defendant terminated Plaintiff's employment because she reported gender-based harassment. Plaintiff has not presented evidence that any of the three decisionmakers, branch manager Williams, HR manager Crabtree, and district manager Rudge, knew Plaintiff had complained about Domine inviting her

to dinner in July 2014. "Essential to showing a causal link is 'evidence that the [decision-maker] was aware that the plaintiff had engaged in the protected activity' at the time of making the decision adversely affecting the plaintiff's employment." *Conroy v. Hewlett Packard Co.*, No. 3:14-cv-01580-AC, 2016 WL 1276552, at \*16 (D. Or. Mar. 31, 2016) (quoting *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982)).

Williams did know that Plaintiff complained about Domine's coaching session statement, but the evidence shows that Plaintiff complained because she was concerned that Williams and Van Der Sluis had given up on her and that her job was in jeopardy. There is no evidence that Plaintiff complained to anyone before her termination that Domine's statement was an attempt to coerce her to go out with him. "[C]omplaints that do not mention or suggest discrimination are not protected activity." *Sanchez v. Purina Animal Nutrition, LLC*, No. 03:13-cv-00864-HZ, 2015 WL 667619, at \*6 (D. Or. Feb. 13, 2015) (citing *Jamal v. Wilshire Mgmt. Leasing Corp.*, 320 F. Supp. 2d 1060, 1079 (D. Or. 2004) (complaints that a supervisor was a "bad manager" but did not mention or suggest discrimination were not protected activity); *Fitzpatrick v. Farmers Ins. Exch.*, No. 03:11–cv–00553–KI, 2012 WL 6584980, at \*4 (D. Or. Dec. 17, 2012) (complaints about unfair treatment insufficient)). Because Plaintiff's second complaint about Domine was not about gender-based harassment, it cannot support her retaliation claim.

Timing may show retaliation. *See Villiarimo v. Aloha Island Air, Inc.*, 686 F.2d 793, 1065 (9th Cir. 2002) ("in some cases, causation can be inferred from timing alone" if the alleged retaliation follows "on the heels of protected activity"). Here, Plaintiff alleges that she refused Domine's dinner invitation in July 2014. She received an Action Plan in October 2014, but she admits that the Action Plan was justified because of her failures to balance her accounts. In early 2015, Plaintiff received a more favorable performance review for 2014 than she had received for

her performance in 2013. Plaintiff's second Action Plan, issued in February 2015, was also

justified, and Plaintiff received a merit pay raise in March 2015. Plaintiff was terminated in May

2015. The timing of events here does not support Plaintiff's retaliation claim.

Plaintiff alleges that Domine was responsible for the February 2015 Action Plan. The

Action Plan was issued by Van Der Sluis, who was in charge of reviewing teller balancing

reports. Discussing Action Plans is part of Domine's duties as a manager. In any event, Plaintiff

admits that the 2015 Action Plan was justified.

In her declaration, Plaintiff states that she was "shocked [by her termination] because I

hadn't done anything wrong and had nearly completed my action plan, which was set to expire

on May 26, 2015." Lord Decl. ¶ 21. But it is undisputed that Plaintiff conducted personal

business with a customer at her teller window, which violated Defendant's ethical rules.

Assuming Plaintiff could show a prima facie case of retaliation, I conclude that

Defendant has presented sufficient evidence that its reasons for terminating Plaintiff were not

pretextual. To avoid summary judgment, Plaintiff must offer "specific and significantly

probative" evidence that Defendant's explanation for its action is a pretext for discrimination.

*Schuler v. Chronicle Broadcasting Co.*, 793 F.2d 1010, 1011 (9th Cir. 1986). Plaintiff has not

done so here. In her declaration, Plaintiff states, "I can only imagine that [Defendant] wanted to

get rid of me because of my complaints about Domine and that Patterson wanted me fired

because of the incidents with Jamaine [Grayson] and Walli [Trice]. Patterson is the only person I

could imagine would have manufactured such allegations." Lord Decl. ¶ 22. Plaintiff's

statement that she "can only imagine" Defendant's motivation for terminating her is not

probative evidence of pretext. Defendant's stated reasons for terminating Plaintiff are supported

by undisputed evidence in the record. Defendant is entitled to summary judgment on Plaintiff's

retaliation claim.

## II. Discrimination Claim

Plaintiff brings a claim for sex discrimination based on Oregon law, which prohibits an employer from discriminating against an employee based on sex "in compensation or in terms, conditions or privileges of employment." Or. Rev. Stat. § 659A.030(1)(b). "The standard for establishing a prima facie case of discrimination under Oregon law is identical to that used under federal law." *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001). To prevail on her discrimination claim, Plaintiff must show that: (1) she belonged to a protected class; (2) she performed her job satisfactorily; (3) she suffered an adverse employment action; and (4) Defendant treated her differently from a similarly situated employee who does not belong to the same protected class as Plaintiff. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

If Plaintiff establishes a prima facie case, then Defendant can rebut the presumption of discrimination by producing evidence that Defendant undertook the challenged employment action for a "legitimate, nondiscriminatory reason." *Id.* If Defendant rebuts the presumption, then Plaintiff can defeat summary judgment by offering evidence that the proffered explanation is a pretext for discrimination. *See Warren v. City of Carlsbad*, 58 F.3d 439, 443 (9th Cir. 1995) (to survive summary judgment, a plaintiff must produce evidence to allow a reasonable fact finder to conclude that the alleged reason for discharge was false, or that the true reason for the discharge was a discriminatory one).

Here, Plaintiff has not presented evidence from which a reasonable jury could find gender discrimination. Plaintiff has not shown that Defendant treated her differently from similarly situated employees who were not in her protected class. Defendant submits evidence that Andre

Page -13- OPINION AND ORDER

Yu, a male teller, was also issued Action Plans for problems similar to Plaintiff's. There is no evidence that any other teller conducted a personal financial transaction with a customer in the bank and was not disciplined.

Plaintiff argues that Patterson discriminated against her based on gender, alleging that Patterson was jealous of Plaintiff's friendly relationships with several male customers. As evidence of discrimination, Plaintiff cites Patterson's complaint that Plaintiff's miniskirt violated Defendant's dress code.

Plaintiff does not contend that her skirt was in compliance with the dress code. Even if the dress was in compliance, Plaintiff's allegation that Patterson was jealous of the attention Plaintiff received from certain male bank customers does not support a claim for gender discrimination. "[P]ersonal conflict does not equate with discriminatory animus." *Barnett v. Dep't of Veterans Affairs*, 153 F.3d 338, 342-43 (6th Cir. 1998); *Vore v. Indiana Bell Tel. Co.*, 32 F.3d 1161, 1162 (7th Cir. 1994) ("[P]ersonality conflicts between employees are not the business of the federal courts.").

Nor do Domine's alleged sarcastic comments about Plaintiff's dating show sex discrimination. Plaintiff never complained about the comments, and she testified that she was not offended by them. No reasonable jury could find that Domine's alleged comments were evidence of gender discrimination. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (discussing Title VII) (internal citation omitted); *see also Jordan v. Clark*, 847 F.2d 1368, 1374-75 (9th Cir. 1988) (no hostile work environment where "off-color" jokes were told in workplace). Defendant is entitled to summary judgment on Plaintiff's discrimination claim.

## CONCLUSION

Defendant's Motion for Summary Judgment, ECF No. 20, is GRANTED.  Defendant's

Motions to Strike, contained in the Motion for Summary Judgment, are DENIED as moot.

IT IS SO ORDERED.

Dated this 28th day of February, 2017.

Honorable Paul Papak
United States Magistrate Judge